22-1624
*Hadwan v. US Dep't of State*

# In the
# United States Court of Appeals
# for the Second Circuit

August Term 2023
Argued: December 12, 2023
Decided: June 3, 2025

No. 22-1624

MANSOOR HAMOUD HADWAN,
*Plaintiff-Appellant*,

v.

UNITED STATES DEPARTMENT OF STATE, UNITED STATES EMBASSY, SANA'A, YEMEN,
*Defendants-Appellees*.[*]

Appeal from the United States District Court for the Southern District of New York, Caproni, *J.*

Before: CALABRESI, MENASHI, and PÉREZ, *Circuit Judges*.

On appeal from an order and judgment of the United States District Court for the Southern District of New York (Caproni, *J.*).

Plaintiff-Appellant Mansoor Hamoud Hadwan is legally a natural-born U.S. citizen who has been stranded in Yemen for the past twelve years. Hadwan was born in Yemen and lived some of his life in New York and California. In 2013, Hadwan traveled to the U.S. Embassy in Sana'a, Yemen to apply for immigration paperwork for his three children. During that visit, embassy staff retained his Consular Report of Birth Abroad ("CRBA") and U.S. passport. Nine months later, the U.S. Department of State ("State Department") notified Hadwan that it

[*] The Clerk of Court is respectfully directed to amend the official caption as set forth above.

believed his CRBA and passport had been fraudulently obtained and formally revoked both documents. That decision was arbitrary and capricious. Additionally, for reasons not adequately explained in the record, Hadwan was not able to attend his hearing challenging the revocation.

We hold that the State Department erred in two ways. First, the State Department's decision to uphold the revocation of Hadwan's CRBA and passport violated the Administrative Procedure Act. The decision was arbitrary and capricious because the State Department failed to adequately consider material, undisputed facts about Hadwan's English language literacy. And second, the State Department violated Hadwan's constitutional due process rights by revoking his documents and thus limiting his right to travel without providing him an opportunity to be heard at a meaningful time and in a meaningful manner.

Accordingly, the judgment of the district court is REVERSED, and the decision of the State Department to uphold the revocation of Plaintiff-Appellant's CRBA and passport is REVERSED. The State Department is ORDERED to return Hadwan's CRBA and expired passport so that he may reapply for a new passport if he so chooses.

Judge Menashi dissents in a separate opinion.

---

JULIE A. GOLDBERG, Goldberg and Associates, Bronx, NY, *for Plaintiff-Appellant.*

ANTHONY J. SUN (Christopher Connolly, *on the brief*), Assistant United States Attorneys, *for* Damian Williams, United States Attorney for the Southern District of New York, New York, NY, *for Defendants-Appellees.*

---

2

MYRNA PÉREZ, *Circuit Judge*:

Plaintiff-Appellant Mansoor Hamoud Hadwan is legally a natural-born United States citizen who has been stranded in Yemen for the past twelve years. Hadwan was born in Yemen and lived some of his life in New York and California.[1]  In June 2013, Hadwan traveled to the United States Embassy in Sana'a, Yemen (the "Sana'a Embassy") to apply for immigration paperwork for his three children.  At some point during the several hours Hadwan spent at the embassy that day, embassy staff retained his Consular Report of Birth Abroad ("CRBA") and U.S. passport.  Approximately nine months later, on March 24, 2014, Hadwan received notice that the U.S. Department of State ("State Department") had formally revoked both his CRBA and passport because of material, false statements on his applications for each document.[2]

It has been nearly twelve years since Hadwan first visited the Sana'a Embassy.  In that time, Hadwan has challenged the revocation of his CRBA and passport, first through a State Department agency adjudication, and then through

---

[1] See *infra*, pp. 5–6, for a discussion of the distinction between natural-born and naturalized citizens.
[2] We refer to revocation of Hadwan's CRBA, as we did in *Hizam v. Kerry*, 747 F.3d 102, 104 (2d Cir. 2014), as an interchangeable concept to the regulatory text's reference to "cancel[lation]" of a CRBA, *see* 22 C.F.R. § 51.62(c).

this petition for review pursuant to the Administrative Procedure Act, 5 U.S.C. § 551, *et seq.* And throughout these twelve years, Hadwan has remained in Yemen.

While this case encompasses a complicated factual background and legal framework, the actual question at issue before this Court is narrow: whether the State Department erred in upholding the revocation of Hadwan's CRBA and passport. What is *not* at issue is any question regarding Hadwan's citizenship.[3]

We hold that the State Department erred in upholding the revocation of Hadwan's documents in two ways. First, the State Department's decision was arbitrary and capricious in violation of the Administrative Procedure Act because it failed to adequately consider material, undisputed facts about Hadwan's English language literacy that raised doubts as to the reliability of his alleged confession statement. And second, the State Department violated Hadwan's constitutional due process rights by revoking his CRBA and passport and thus limiting his right to travel without providing him an opportunity to be heard at a meaningful time and in a meaningful manner. Accordingly, the judgment of the

---

[3] *See* J. App'x 14 (formal revocation letter informing Hadwan that his revocation hearing "would address only the evidence presented upon which the CRBA and passport were erroneously issued, not your citizenship status"); *id*. at 20 (letter to Hadwan's attorney informing him that the "*only* issue for consideration and decision will be whether or not the Department satisfied the requirements or conditions of the applicable passport regulations cited as the basis for its adverse action, *not the citizenship status of your client*" (emphasis in original)).

District Court is REVERSED, and the decision of the State Department to uphold the revocation of Plaintiff-Appellant's passport is REVERSED. The State Department is ORDERED to return Hadwan's CRBA and expired passport to him so that he may reapply for a new passport if he so chooses.[4]

## BACKGROUND

We begin with a brief discussion of Hadwan's citizenship status, the retention and revocation of Hadwan's CRBA and passport, the procedural history of this case, and important context regarding passport revocations at the Sana'a Embassy.

### I. Factual Background

According to his CRBA, Hadwan was born in Yemen in 1988 to a Yemeni mother, Sabrah Saleh Hadwan, and U.S. citizen father, Hamoud Abbas Hadwan.

Our Constitution and statutes recognize "two sources of citizenship, and two only: birth and naturalization." *United States v. Wong Kim Ark*, 169 U.S. 649,

---

[4] Nothing in the administrative record specifically notes that Hadwan's passport is expired. However, a "passport shall be valid for a period of ten years from the date of issue, except that the Secretary of State may limit the validity of a passport to a period of less than ten years in an individual case or on a general basis pursuant to regulation." 22 U.S.C. § 217a. The administrative record establishes that Hadwan applied for a passport in 2004 and does not indicate anywhere that he successfully renewed that passport before it was revoked in 2014. *See* J. App'x 3. But even if Hadwan did renew his passport at some point before it was revoked, it has been more than ten years since the formal revocation—there is no plausible reading of the timeline where Hadwan's passport has not expired.

702 (1898).[5] Someone in Hadwan's situation, who is born outside of the United States to a U.S. citizen parent, "becomes a citizen at birth only if the circumstances of birth satisfy the statutory requirements in effect at the time of application." *Hizam v. Kerry*, 747 F.3d 102, 107 (2d Cir. 2014). Because Hadwan's father had been present in the United States for at least five years before his son's birth, Hadwan acquired U.S. citizenship at birth. *See* 8 U.S.C. § 1401(g).

Natural-born citizens who are born outside of the United States may obtain a CRBA as documentation of their citizenship by submitting "satisfactory proof of birth, identity and nationality" to a U.S. consular officer. 22 C.F.R. § 50.7(a);[6] *see also* 22 U.S.C. § 2705. The issuance of a CRBA "does not grant citizenship—it simply certifies that a person was a citizen at birth," and "[i]ssuing or revoking a CRBA does not change the underlying circumstances of an individual's birth and does not affect an individual's citizenship status." *Hizam*, 747 F.3d at 107. Hadwan obtained his CRBA from the Sana'a Embassy in 1998, when he was ten years old. He subsequently obtained a U.S. passport in 2004.

---

[5] A person may be a natural-born citizen constitutionally, U.S. Const. amend. XIV, § 1, or by statute, 8 U.S.C. § 1401(c)–(h). Not all citizenship acquired by statute is naturalization. And not all citizenship acquired at birth comes from the Constitution and from being born within the territorial boundaries of the United States. A person born a citizen pursuant to a statute, like Hadwan, is a natural-born citizen.

[6] This opinion cites to the version of Title 22 of the Code of Federal Regulations in effect at the time of publication, except where otherwise specified because of relevant differences from the language of the regulations applicable at the time of Hadwan's hearing.

After obtaining his CRBA, Hadwan spent some of his life in the United States. In 2013, he returned to Yemen, and on June 9, 2013, he visited the Sana'a Embassy to apply for immigration paperwork for his three children.

The parties dispute what happened during Hadwan's visit to the Sana'a Embassy. The government asserts that during an interview with Diplomatic Security Service Special Agent David W. Howell, Hadwan admitted that most of the details on his CRBA and passport applications were false, and that Hamoud Hadwan was not his father, but a relative who had illegally smuggled him into the United States as a child. The government produced a statement signed by Hadwan, Howell, and a witness identified as "Mohammed" reflecting the details of the alleged confession. *See* J. App'x 39–42. Hadwan alleges that Howell deceived him into signing this statement. It is undisputed that Hadwan left the Sana'a Embassy on June 9, 2013, without a CRBA or passport and has been without these documents for nearly twelve years now.

On March 24, 2014, nine months after Hadwan left the embassy, the State Department formally notified Hadwan that his CRBA and passport had been revoked. The State Department's revocation letter stated that a "Department investigation has revealed that your parents are not Hamoud Abbas Hadwan and

7

Sabrah Saleh Hadwan" and that "[b]ecause there are false statements of material fact on your application for a CRBA and because you do not have an established claim to U.S. citizenship, your CRBA and passport are revoked pursuant to Section 361 of the Immigration and Nationality Act." *Id.* at 14. The revocation letter properly informed Hadwan of his right to request a hearing, pursuant to 22 C.F.R. § 51.70, *et seq.*, and informed him that "[t]his hearing would address *only* the evidence presented upon which the CRBA and passport were erroneously issued, *not* your citizenship status." *Id.* (emphases added).

## II. Procedural History

Hadwan's family in the United States retained an attorney, who timely requested a hearing to challenge the revocation of his CRBA and passport. *See id.* at 15.

### A. Agency Proceedings

The State Department initially scheduled the hearing to occur on July 2, 2014, at the Office of Passport Services in Washington, D.C. The State Department's scheduling notification letter made two important legal points: that "[t]he *only* issue for consideration and decision will be whether or not the Department satisfied the requirements or conditions of the applicable passport

8

regulations cited as the basis for its adverse action, *not the citizenship status of your client*," and that "22 C.F.R. § 51.71(b) permits your client to appear at the hearing in person." *Id*. at 20–21 (emphasis in original).

Hadwan's attorney requested an adjournment until August or September, stating that he was "attempting to obtain evidence from Yemen which has been problematic, and may conclusively resolve the entire matter." *Id*. at 62. The State Department's attorney did not object, and the Hearing Officer granted this request and rescheduled the hearing for August 27, 2014. On August 7, 2014, before the rescheduled hearing, Hadwan's attorney requested another adjournment, noting his continued difficulties in obtaining evidence from Yemen. The State Department's attorney refused to consent to this second request, informing the Hearing Officer that there was a "general policy" of allowing only one thirty-day continuance. *Id*. at 89. The Hearing Officer stated that she would "rather give him opportunity to get full info, but if the policy is hard/fast, then we have to say no." *Id*. at 97. The State Department's attorney responded that this was a "hard policy." *Id*.[7] The Hearing Officer then denied the second request.

---

[7] The State Department has never identified the source of this "hard policy."

Before discussing the August 27, 2014, hearing, it is important to explain why Hadwan himself was unable to attend. When the State Department revokes a citizen's passport while the citizen is abroad, federal regulations allow it to issue the citizen a limited validity passport in order to return to the United States. *See* 22 C.F.R. § 51.60(a) (explaining under what circumstances denial of a passport is mandatory, but carving out an exception for "a passport for direct return to the United States"); *id*. § 51.62(a)(2) (authorizing the State Department to "limit" passports obtained illegally). Hadwan states that he filed three separate applications for a limited validity passport to return to the United States to attend his hearing, all of which were denied. Appellant's Br. 3. It is unclear from the record why Hadwan was unable to obtain a limited validity passport.[8]

---

[8] In a Rule 28(j) letter filed shortly after oral argument in this appeal, Hadwan's attorney attested that she had intended to attach an affidavit from Hadwan to the original complaint in this matter that, among other things, would have identified the specific dates of the three applications for a limited validity passport, but had failed to include the affidavit. Such a critical oversight and the failure to correct it for more than six years is inexcusable and potentially sanctionable conduct from a member of the bar of this Court—especially an attorney taking responsibility for protecting client interests as important as the constitutional and statutory rights at stake in this case. To the extent counsel's letter can be construed as a motion to supplement the record to include the affidavit, this motion is denied.

Nevertheless, the State Department presented no evidence to the agency or the district court suggesting that Hadwan had *not* submitted such applications. Because we "view[] the evidence in the light most favorable to the nonmoving party" on appeal from a grant of summary judgment, *Murphy v. Hughson*, 82 F.4th 177, 183 (2d Cir. 2023), in the absence of any countervailing evidence from the government, we may accept Hadwan's allegations regarding these applications as true. *See also Vt. Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) ("If the evidence submitted in support of the summary judgment motion does not meet the movant's burden of production, then summary judgment must be denied even if no opposing evidentiary matter is presented." (emphasis omitted) (internal quotation marks

The hearing thus took place on August 27, 2014, without Hadwan present. Hadwan's attorney was never able to meet with Hadwan, communicate directly with him, or secure evidence from Yemen, which could have included a DNA test establishing Hadwan's biological relationship to his U.S. citizen father or a signed affidavit from Hadwan himself. The only evidence in the record was Hadwan's CRBA, Hadwan's passport application, and the confession statement that Hadwan alleges he was deceived into signing. *See* J. App'x 45.

At the hearing, Hadwan's attorney argued that the State Department had not met its burden to provide factual support for the revocation because the confession statement was unreliable. Specifically, Hadwan's attorney pointed to the fact that the confession statement "clearly states that he does not read or write well in English," but nevertheless lacked "an affidavit from Mr. Howell . . . that he

and citation omitted)). We also note that the State Department's Office of the Inspector General has found that record-keeping related to passport issues was exceptionally poor at the Sana'a Embassy during the events in question. Off. Evaluations & Special Projects, Off. Inspector Gen., U.S. Dep't State, *Review of Allegations of Improper Passport Seizures at Embassy Sana'a, Yemen*, ESP-19-01, at 8–9 (Oct. 2018) (the "OIG Report").

In addition, we note that the OIG Report found that a February 3, 2014, diplomatic cable sent from the State Department to the Sana'a Embassy instructed embassy staff to inform citizens with revoked passports that they could use their naturalization certificates to obtain limited validity passports in order to travel to the United States. OIG Report 41. It is possible that the Sana'a Embassy denied Hadwan's requests because he did not squarely fit within this guidance owing to his status as a natural-born citizen whose CRBA had been revoked, instead of a naturalized citizen.

translated or somebody else translated this accurately into the Arabic language." *Id*. at 111.

The attorney went on to argue that this suggested "there's a big question as to whether or not this statement is accurate or whether Mr. Hadwan actually knew what he signed." *Id*. In addition to these substantive arguments, Hadwan's attorney also argued that it was a deprivation of Hadwan's rights as a U.S. citizen to revoke his CRBA and passport "without giving him the opportunity to establish that he is a citizen and that he is the son of who he claims to be," such as by submitting a DNA sample. *Id*. at 113.

The Hearing Officer issued her findings and recommendation that the State Department uphold the revocation of Hadwan's CRBA and passport on March 31, 2015. She found that there was no issue of knowledge with respect to the statement because the statement itself contains the words "[t]his document was read to me in Arabic and I understood its contents completely," as well as "Hadwan's signature and initials."[9] *Id*. at 144. She also noted that Hadwan had

---

[9] The parties and the district court have treated the record imprecisely. They repeatedly frame their points in terms of "voluntariness," even when expressly addressing Hadwan's arguments about knowledge. *See, e.g.*, Appellees' Br. 37 ("In support of his challenge to voluntariness, [attorney] Baker [for Hadwan] argued only that . . . there was no evidence that Hadwan understood the statement based on his limited knowledge of English, [and] there was no affidavit from the Arabic translator."); *Hadwan v. U.S. Dep't of State*, No. 17-CV-578, 2022 WL 1720397, at *5 (S.D.N.Y. May 27, 2022) (describing the agency's "reject[ion of] the

not presented any other evidence at the hearing, and that while Hadwan's attorney "offered to obtain a DNA sampling from his client[,] . . . none was presented at the hearing." *Id*. The Deputy Assistant Secretary for Passport Services formally adopted this recommendation on April 7, 2015.

## B. Federal Court Proceedings

Hadwan initiated this lawsuit in January 2017. After the district court denied Hadwan's motion to supplement the administrative record, he filed the operative Third Amended Complaint on July 3, 2019. The Third Amended Complaint alleges that Defendants' interpretation of 8 U.S.C. § 1504, the statute authorizing passport revocations, was unconstitutional and exceeded statutory authority; that Defendants were required to apply a "clear and convincing evidence" standard and the Administrative Procedure Act's formal adjudication requirements at Hadwan's revocation hearing, and failed to do so; that Defendants violated the Administrative Procedure Act and Hadwan's due process rights by relying on the allegedly coerced statement; and that Defendants' failure to provide

---

argument that [Hadwan] did not understand the contents of the statement he signed" as an "unsupported reason[] why [the] statement was involuntary"); J. App'x 210. But Appellees nowhere suggest that this imprecision should be construed as Hadwan's abandonment of his argument before the agency that he was "putting . . . into question" whether the statement "was voluntarily given and knowingly [given]." J. App'x 114.

13

Hadwan with written notice of his revocation or a prompt and meaningful hearing violated his due process rights.

The district court granted the government's motion to dismiss David Howell as a defendant on October 3, 2019. Hadwan does not appeal this portion of the district court's decision.

After denying Hadwan's motion for discovery, the district court granted summary judgment to the government on all claims on May 27, 2022. The district court found that Hadwan had waived most of his arguments by not presenting them at the agency hearing—a hearing that Hadwan was not permitted to attend. The district court also found that Hadwan had properly preserved a claim that the government had failed to provide affidavits to establish that the statement was properly translated. Finally, the district court found that each of Hadwan's claims concerning the agency hearing itself, including the claims that it should have been conducted according to the Administrative Procedure Act's formal adjudication requirements and that the hearing officer should have applied a clear and convincing evidence standard, failed on the merits.

Judgment was entered on May 31, 2022, and Hadwan filed a timely notice of appeal.

### III.    Hadwan's Subsequent Passport Applications

As discussed *supra*, Hadwan has been unable to return to the United States since his CRBA and passport were first retained in 2013.  At oral argument in this appeal, Hadwan's attorney attested that in the nearly twelve years since then, he has attempted to apply for a new passport at least twice—first at the Sana'a Embassy before it closed because of the conflict in Yemen, and later at the U.S. Embassy in Djibouti.

Because of the limited nature of the administrative record in Administrative Procedure Act cases such as this one, and because of Hadwan's attorney's aforementioned failure to attach an affidavit from Hadwan to the initial complaint, *see supra* note 8, we cannot say for certain whether and how many times Hadwan has applied for a new passport since the initial retention and revocation.  However, as the State Department's Office of the Inspector General noted in its report discussed *infra*, any such application would have been unsuccessful because "[r]evocation is the process by which the Department invalidates the individual's passport; the individual cannot obtain another passport until the underlying issue precipitating the revocation is resolved."  Off. Evaluations & Special Projects, Off.

Inspector Gen., U.S. Dep't State, *Review of Allegations of Improper Passport Seizures at Embassy Sana'a, Yemen*, ESP-19-01, at 6 (Oct. 2018) (the "OIG Report").

## IV. Subsequent Investigations into Passport Revocations at the Sana'a Embassy

Finally, we note that Hadwan's case is far from the first time a federal court has been asked to examine the actions of Howell and other State Department staff at the Sana'a Embassy with respect to passport revocations in 2013 and 2014. *See, e.g.*, *Alzokari v. Pompeo*, 973 F.3d 65 (2d Cir. 2020); *Ali v. Pompeo*, No. 16-CV-3691, 2020 WL 2312626 (E.D.N.Y. Apr. 30, 2020).

The OIG Report, which is referenced in Hadwan's operative complaint, provides a detailed description of a pattern of wrongful passport revocations at the Sana'a Embassy in that period. We take judicial notice of this document. *See Cangemi v. United States*, 13 F.4th 115, 124 n.4 (2d Cir. 2021) (taking judicial notice of a government report); *see also Rynasko v. N.Y. Univ.*, 63 F.4th 186, 191 n.4 (2d Cir. 2023) (explaining that we may take judicial notice of documents from official government websites); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (indicating that a court may take judicial notice of documents incorporated by reference into a complaint).

The OIG Report summarized an investigation conducted in response to "allegations from relatives of affected citizens regarding 'improper confiscation' of U.S. passports in the spring of 2013." OIG Report 2. Specifically, the allegations concerned "an Assistant Regional Security Officer for Investigations" who "took possession of [these citizens'] passports and other documents they had submitted to embassy consular officials in support of . . . requested services." *Id*. While the OIG Report itself does not identify him by name, the documents the report cites clearly establish that the "Assistant Regional Security Officer for Investigations" is Howell.

The OIG Report examined 31 specific examples of passport revocations involving individuals who spoke with Howell at the Sana'a Embassy between 2012 and 2014, and found that in 30 of the 31 examples, the State Department failed to comply with relevant standards and regulations in retaining and ultimately revoking the passports. The OIG Report identified a range of errors that Howell and other State Department staff committed, including failing to track and document revocations, retaining passports for too long before issuing formal revocations, providing inadequate notice of formal revocations, and relying on

17

incorrect legal guidance from a State Department paralegal when considering whether to retain and confiscate passports. *See id*. at 8–17.

The findings in this report were not made public until long after Hadwan's agency hearing and thus were not relevant to the State Department's decision to uphold the revocation of Hadwan's CRBA and passport. However, as we explain *infra*, these findings provide important context for the due process issues that plague Hadwan's case. *See Alzokari*, 973 F.3d at 68 n.6 (noting that "during his tenure at the United States Embassy in Sana'a, Yemen," "Special Agent Howell has obtained strikingly similar statements" indicating that the signatory, who later asserted he did not understand the statement, had been smuggled into the United States by an individual who falsely claimed the signatory was his child).

Hadwan alleges that he is individual #31 in the OIG Report. The OIG Report specifically found that there were "no particularized national security concerns" with respect to any of the 31 individuals. OIG Report 21.

## DISCUSSION

We reverse the judgment of the district court and the State Department's decision to uphold the revocation of Hadwan's CRBA and passport. In doing so, we find that the State Department erred in two ways.

18

First, the State Department's decision to uphold the revocation was arbitrary and capricious and violated the Administrative Procedure Act.  Undisputed facts in the agency record establish that Hadwan could not read or write English, and that the confession statement did not include any competent certification that it was read to Hadwan in his native language.  The State Department's decision did not adequately address these material, undisputed facts, which undermine the reliability of the only relevant piece of evidence in the record.  The State Department thus "entirely failed to consider an important aspect of the problem." *Alzokari*, 973 F.3d at 70 (citation omitted).

And second, the State Department violated Hadwan's constitutional due process rights by revoking his travel documents and abridging his right to travel without providing him with any meaningful opportunity to be heard.  Because of an unusual and confounding interaction among statutes, regulations, and written and unwritten State Department policies, Hadwan was unable to attend his own revocation hearing.  In holding that Hadwan's due process rights were violated, we do not attempt to call into question the constitutionality of any specific aspect of the State Department's adjudication process for CRBA and passport

revocations—we merely find that as applied to this case, that process failed to protect Hadwan's rights.

## I.  Hadwan's Claims under the Administrative Procedure Act

First, we conclude that the State Department's decision to uphold the revocation of Hadwan's CRBA and passport was arbitrary and capricious in violation of the Administrative Procedure Act.  *See* 5 U.S.C. § 706(2)(A).  The State Department's decision failed to adequately address material, undisputed facts concerning Hadwan's English literacy and the context surrounding the alleged confession statement.  Because the confession statement itself is the only relevant piece of evidence in the agency record, the decision to uphold the revocations was not adequately supported.

### A. Relevant Law

As with any Administrative Procedure Act claim, two sources of law are relevant to this analysis: the Administrative Procedure Act itself and the substantive statutes and regulations governing State Department passport adjudications.

### 1. Standard of Review and the Administrative Procedure Act

"On appeal from a grant of summary judgment involving a claim brought under the Administrative Procedure Act, we review the administrative record *de novo* without according deference to the decision of the district court." *Karpova v. Snow*, 497 F.3d 262, 267 (2d Cir. 2007).

Under the Administrative Procedure Act, we must "hold unlawful and set aside [any] agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). When reviewing agency decisions, "'[t]he scope of review under the "arbitrary and capricious standard" is narrow,' and courts should not substitute their judgment for that of the agency." *Karpova*, 497 F.3d at 267 (alteration in original) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983)).

Agency decisions under the Administrative Procedure Act must "be reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency's decision "is arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem." *Alzokari*, 973 F.3d at 70 (internal quotation marks and citation omitted). And our review is bound by "the rule that judges generally must assess the lawfulness of an agency's

action in light of the explanations the agency offered for it rather than any *ex post* rationales a court can devise." *Kakar v. U.S. Citizenship & Immigr. Servs.*, 29 F.4th 129, 132 (quoting *Garland v. Ming Dai*, 593 U.S. 357, 369 (2021)).

## 2. The Regulatory Framework of Passport Revocations

Under the Immigration and Nationality Act, the "Secretary of State is authorized to cancel any U.S. passport or Consular Report of Birth . . . if it appears that such document was illegally, fraudulently, or erroneously obtained." 8 U.S.C. § 1504(a). A "cancellation . . . of any document purporting to show the citizenship status of a person to whom it was issued shall affect only the document and not the citizenship status of the person in whose name the document was issued." *Id.*; *see also Hizam*, 747 F.3d at 107–08.

The Immigration and Nationality Act's implementing regulations establish that the State Department "may revoke or limit" a CRBA or passport when the document was "illegally, fraudulently or erroneously obtained from the Department; or was created through illegality or fraud practiced upon the Department." 22 C.F.R. § 51.62(a)(2), (c)(1). The State Department "will send notice in writing to any person whose . . . passport has been revoked, or whose Consular Report of Birth Abroad has been cancelled. The notification will set forth

22

the specific reasons for the denial, revocation or cancellation and, if applicable, the procedures for review available under 22 C.F.R. 51.70 through 51.74." *Id*. § 51.65(a).

Any person whose CRBA or passport is revoked may "request a hearing to review the basis for the denial, revocation, or cancellation." *Id.* § 51.70(a). Section 51.71 governs such hearings. The State Department "will name a hearing officer" who "will make only preliminary findings of fact and submit recommendations . . . to the Deputy Assistant Secretary for Passport Services." *Id.* § 51.71(a). The Deputy Assistant Secretary makes the final determination based on the recommendation from the hearing officer. *See id*. § 51.74. The "person requesting the hearing may testify in person, offer evidence . . . , present witnesses, and make arguments at the hearing." *Id*. § 51.71(d). "Formal rules of evidence also do not apply; however, the hearing officer may impose reasonable restrictions on relevancy, materiality, and competency of evidence presented." *Id*. § 51.71(e). "The hearing officer may not consider any information that is not also made available to the person requesting the hearing, the Department, and made a part of the record of the proceeding." *Id*. And finally, "[i]f any witness is unable to

23

appear, the hearing officer may, in his or her discretion, accept an affidavit or sworn deposition testimony of the witness." *Id.* § 51.71(f).

In addition to formal revocations, the State Department's Foreign Affairs Manual in effect at the time of Hadwan's revocation created a process allowing consular officials to "retain" a citizen's CRBA or passport upon a suspicion of fraud. OIG Report 5.

## B. Analysis

In ignoring several material, undisputed facts concerning Hadwan's English literacy and the circumstances surrounding the confession statement, the State Department "entirely failed to consider an important aspect of the problem." *Alzokari*, 973 F.3d at 70 (citation omitted). Hadwan's attorney pointed to the following undisputed facts at the agency hearing: (1) Hadwan cannot read or write in English; (2) because of his English language illiteracy, Hadwan could not have prepared the statement himself; (3) the record contained absolutely no context, outside of the disputed statement itself, for why and how the statement was prepared; (4) the statement is not accompanied by any sworn testimony from Howell explaining as such; and (5) the statement is not accompanied by any sworn

24

testimony or certification to show that it was accurately translated to Arabic for Hadwan. *See* J. App'x 110–11.

Taken together, these undisputed facts presented a compelling "big question as to whether or not this statement is accurate or whether Mr. Hadwan actually knew what he signed." *Id.* at 111 (*In re Hadwan Mansour Abbas Hadwan* Hearing Tr. 7:11–:18 (Statement of Howard L. Baker)). The hearing transcript and the State Department's written decision entirely fail to answer that question. *Contra* Dissenting Op. 4–7.

After hearing Hadwan's attorney's argument, the hearing officer asked only a few follow-up questions. In response to the suggestion that the statement could have been coerced, she asked, "So you have no information from him on what transpired that day or from his perspective what happened?" *Id.* at 118. And after Hadwan's attorney represented that he had spoken with Hadwan's family about what transpired at the Sana'a Embassy, the hearing office asked, "And I guess you don't know with whom . . . he communicated . . . at the Embassy?" *Id.* at 119. Finally, following Hadwan's attorney's rebuttal focusing on the State Department's lack of evidence, the hearing office inquired after how many children Hadwan has and whether he is married. *Id.* at 121–23. This brief

questioning constitutes essentially the entire hearing record. The hearing officer did not ask any questions of Hadwan's attorney or the State Department regarding the circumstances of Hadwan's interview or the characteristics of the confession statement itself. As Hadwan's attorney pointed out on the record at the hearing, the State Department presented "nothing further than this [confession] statement." *Id*. at 122 (*In re Hadwan Mansour Abbas Hadwan* Hearing Tr. 18:4–:7 (Statement of Howard L. Baker)).

The only answer the State Department provided to the question of whether Hadwan "knew" what he signed stemmed, circularly, from the text of the confession statement itself. In the written decision, the hearing officer noted that because the statement attests that "[t]his document was read to me in Arabic and I understood its contents completely" and "bears Mr. Hadwan's signature and initials," Hadwan "did understand the content of the confession." *Id*. at 144. This reasoning is insufficient for two reasons.

To begin, an argument that a statement in a foreign language was not signed knowingly is not disproven merely by pointing to the *content* of the statement itself. Contract law does establish that as a general rule, a signatory to a document cannot later refute the document by alleging that he did not read it. *See*, *e.g.*, *Upton*

26

*v. Tribilcock*, 91 U.S. 45, 50 (1875).  But the statement in question is not a contract.  Rather than memorialize a negotiated understanding, it only purports to memorialize information Hadwan shared orally in Arabic, which he then supposedly relied on State Department agents to set forth in English.  Testimony or an affidavit from Howell or a translator might have solved the problem of the confession statement's reliability—but, as discussed *supra*, the State Department submitted nothing of the kind.

Relatedly, the confession statement itself contains facial discrepancies that the State Department has never adequately addressed.  No party disputes that the handwritten signature on the last page of the confession statement is Hadwan's, or that it is identical to his actual signature on other documents in the record.  However, the substance of the confession statement is contained entirely on the *first* three pages, which bear only the handwritten initials "H.H."  *See* J. App'x 39–41.  The "H.H." is written in handwriting that is obviously very different from Hadwan's actual signature on the last page of the confession statement.  And more importantly, Hadwan signed the document as "Mansoor Hadwan," which does not match the initials "H.H." at all.  It is unclear why Hadwan would sign a document as "Mansoor Hadwan," when said document purports to show that his

27

actual name is "Hadwan Mansour Abbas Hadwan." *Id*. at 39. These inconsistencies are obvious from the face of the confession statement itself, and in failing to address them in its decision, the State Department acted in an arbitrary and capricious manner.

The dissenting opinion nevertheless contends that Hadwan offered "no" affirmative "evidence" to contradict the knowing and voluntary nature of the confession statement. Dissenting Op. 5. That view flips our task on its head. On the arbitrary-or-capricious standard, we focus on whether the *agency* properly supported *its action*. *See* J. App'x 20 (agency's letter explaining that "[t]he only issue for consideration and decision will be whether or not *the Department satisfied the requirements or conditions of the applicable passport regulations* cited as the basis for its adverse action" (altered emphases)). An agency's decision is unsupported where the evidence before it was "not enough to justify, if the trial were to a jury, a refusal to direct a verdict." *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984) (quoting *Ill. Cent. R.R. v. Norfolk & W. Ry.*, 385 U.S. 57, 66 (1966)). Just so here. The undisputed issue of Hadwan's English literacy, along with the discrepancies in the signature and initials that appear in the confession statement, defeat the view that the agency's

28

decision was "reasonable and reasonably explained." *See Prometheus Radio Project*, 592 U.S. at 423; *cf.* Dissenting Op. 7.[10]

Because of the State Department's failure to adequately address these significant issues in the record, we cannot "reasonably . . . discern[]" "the agency's path." *State Farm*, 463 U.S. at 43 (citation omitted). The State Department's decision is unsupported by the factual record that was before it. Its decision was thus arbitrary and capricious, and we reverse it pursuant to 5 U.S.C. § 706(2)(A).

## II. Hadwan's Claims under the Due Process Clause of the Fifth Amendment

The State Department also violated Hadwan's procedural due process rights under the Fifth Amendment of the U.S. Constitution. Due process "provides that certain substantive rights—life, liberty, and property—cannot be deprived except pursuant to constitutionally adequate procedures." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 541 (1985). Hadwan's CRBA and passport conferred upon him a constitutionally protected interest in his right to travel. By revoking these documents without providing Hadwan with any meaningful

---

[10] The dissenting opinion also notes that "the level of detail the statement contained suggests that it was authentic." Dissenting Op. 9. While an agency might take into account the specificity of evidence before it to assess reliability, *see id.* (collecting cases), where the agency did not consider other material indicia that a statement is unreliable, its detailed nature cannot, without more, suffice to conform the agency's decision to the Administrative Procedure Act.

29

opportunity to be heard, the State Department deprived Hadwan of that interest without due process of law.

## A. Relevant Law

To prevail on a procedural due process claim, Hadwan "must identify a constitutionally protected property or liberty interest and demonstrate that the government has deprived [him] of the interest without due process of law." *Weinstein v. Albright*, 261 F.3d 127, 134 (2d Cir. 2001).

### 1. Standard of Review

When a district court grants the government summary judgment on a due process claim, "[w]e review that grant *de novo*, construing the facts in the light most favorable" to the plaintiff. *Karpova*, 497 F.3d at 270. "Summary judgment is only appropriate when there is no genuine issue as to any material fact, making judgment appropriate as a matter of law." *Id*.

### 2. The Right to Travel and Due Process

The constitutionally protected interest at issue in this case is the right to travel, which "is a part of the 'liberty' of which the citizen cannot be deprived without the due process of law under the Fifth Amendment." *Kent v. Dulles*, 357 U.S. 116, 125 (1958). "The denial of a passport, given existing domestic and foreign

laws, is a severe restriction upon, and in effect a prohibition against, world-wide foreign travel." *Aptheker v. Sec'y of State*, 378 U.S. 500, 507 (1964). Because the revocation of Hadwan's passport implicates a constitutionally protected liberty interest, "the Due Process Clause applies." *Loudermill*, 470 U.S. at 541. The only "question [that] remains [is] what process is due." *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

### a. The *Mathews v. Eldridge* Framework

"The fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances." *Id.* at 334 (quoting *Cafeteria & Rest. Workers Union, Loc. 473 v. McElroy*, 367 U.S. 886, 895 (1961)). In determining what kind of protections "the particular situation demands," a court must consider "three distinct factors: [f]irst, the private interest . . . ; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest." *Id.* at

31

334–35. When an actual hearing is required, "[t]he liberty interest and legal issues involved determine the kind of hearing necessary." *Karpova*, 497 F.3d at 270.

Under the *Mathews v. Eldridge* due process framework, passport adjudication requires a delicate balancing act because of the significant private and government interests at stake. The "private interest that will be affected by the official action," *Mathews*, 424 U.S. at 335, is weighty because access to a passport is an important "liberty interest protected by the Due Process Clause of the Fifth Amendment." *Weinstein*, 261 F.3d at 140. On the other hand, the government's interest in limiting or revoking passports can be high as well, and the potential for "damage to national security or foreign policy of the United States" is "the single most important criterion in passport decisions." *Haig v. Agee*, 453 U.S. 280, 298 (1981).

### b. Due Process Balancing in State Department Passport Revocations

State Department regulations and policies establish a carefully constructed adjudication system that, in most situations, adequately balances these significant competing interests.

To start, in recognition of the significant national security interests at stake, the adjudicatory process does not entitle any passport holder to the type of

32

"pretermination evidentiary hearing" that the Due Process Clause demands in some situations. *Goldberg v. Kelly*, 397 U.S. 254, 261 (1970) (citation omitted); *see also Loudermill*, 470 U.S. at 542. And the Foreign Affairs Manual allows State Department staff to *temporarily* retain a CRBA or passport without a hearing upon a mere suspicion of fraud. OIG Report 5, 24. The State Department can formally revoke CRBAs or passports before providing a hearing, and it need only provide notice of the formal revocation. *See* 22 C.F.R. §§ 51.62, 51.65. Still, due process requires an ex post hearing at which the person deprived of his passport has a meaningful opportunity to be heard.

The regulations governing the actual hearings balance the significant interests of both the government and the CRBA or passport holder. "[T]he person requesting the hearing may testify in person, offer evidence in his or her own behalf, present witnesses, and make arguments at the hearing." *Id.* § 51.71(d). The current version of the regulations establishes that at any hearing, the "burden of production is on the [State] Department," while the "burden of persuasion is on the person requesting the hearing, to prove by a preponderance of the evidence that the Department improperly revoked the passport . . . or cancelled the Consular Report of Birth Abroad." *Id.* § 51.71(h).

When a passport holder is overseas at the time of the revocation, this balancing act becomes even more complex because the private interest at stake is even greater. If a passport holder's travel documents are revoked while they are outside of the United States, the passport holder may well be unable to re-enter the country, which would constitute a much more significant incursion on the right to travel. However, even in these situations of heightened private interest, the State Department's adjudication system adequately protects due process rights in most situations through other safeguards.[11] These safeguards include the discretion to allow for multiple continuances or accept affidavits or sworn deposition testimony in lieu of witness testimony. *See id.* §§ 51.70(e), 51.71(f).

But most importantly, the regulatory and policy framework creates multiple mechanisms to facilitate a passport holder's ability to attend their revocation hearing in person. Under the current version of the hearing regulations, "if the person requesting the hearing is overseas," the hearing shall take place "at the appropriate U.S. diplomatic or consular post." *Id.* § 51.71(b). The language

---

[11] We do not "conce[de] that Hadwan has not shown that the procedures the agency followed created an 'unacceptably high' risk of an erroneous deprivation" simply because we do not observe systemic issues with the State Department's adjudication process. *See* Dissenting Op. 19 (quoting *Francis v. Fiacco*, 942 F.3d 126, 143 (2d Cir. 2019)). We are required to examine the facts of Hadwan's particular case. Here, the State Department upheld the revocation of a U.S. citizen's CRBA and passport without affording him a meaningful opportunity to contest that revocation in violation of the Due Process Clause.

34

allowing for hearings to take place overseas was not added until 2018. *See* Passports, 83 Fed. Reg. 21872, 21875 (May 11, 2018) (codified at 22 C.F.R. § 51.71 (b)). Even before this additional language was added, though, the State Department was able to facilitate passport holders' ability to attend their hearings in person by issuing limited validity passports for direct return to the United States. As discussed *supra*, regulations allow the State Department to issue limited validity passports in certain situations to allow direct return to the United States. *See* 22 C.F.R. § 51.60(a) (explaining where denial of a passport is mandatory, but carving out an exception for "a passport for direct return to the United States"); *id*. § 51.62(a)(2) (authorizing State Department to "limit" passports obtained illegally).

Indeed, in similar revocation cases arising out of the Sana'a Embassy in 2013, the State Department did in fact issue such limited validity passports for this purpose. *See, e.g., Omar v. Kerry*, No. 15-cv-01760, 2016 WL 617449, at *1 (N.D. Cal. Feb. 16, 2016) ("Plaintiff was stranded in Yemen for 13 months before he was provided a written notice of the basis for his passport revocation and granted a temporary passport to return home to the United States."), *vacated sub nom. Omar v. Pompeo*, No. 15-cv-01760, 2018 WL 4191416 (N.D. Cal. Aug. 16, 2018).

**B. Analysis**

Because of the substantial liberty interest that limiting Hadwan's right to travel implicates, the constitutional guardrails of the Due Process Clause require the State Department to provide at least a post-deprivation hearing to contest the revocations. In effectively barring Hadwan from attending this hearing, the State Department violated Hadwan's due process rights. It failed to provide him with an opportunity to be heard at a meaningful time and in a meaningful manner.

**1. Hadwan's Due Process Claim Has Not Been Waived**

As an initial note, while the district court correctly found that certain claims in this case had been waived, Hadwan's due process claim was not. First, Hadwan was not required to raise his constitutional due process claim before the agency. When "constitutional questions are in issue, the availability of judicial review is presumed." *Califano v. Sanders*, 430 U.S. 99, 109 (1977). Because Hadwan properly "exhausted the full set of available administrative review procedures, failure to have raised his constitutional claim would not bar him from asserting it later in a district court." *Mathews*, 424 U.S. at 329 n.10.

And second, we reject any suggestion that Hadwan did not preserve this claim in his pleading to the district court. Counts One and Four of Hadwan's Third

Amended Complaint properly suggest that the State Department's hearing process violated his due process rights.

## 2. Hadwan's Due Process Claim Succeeds on the Merits

Because he was not able to attend his own revocation hearing or even participate meaningfully in making his arguments, Hadwan was not afforded an "opportunity to be heard at a meaningful time and in a meaningful manner." *Mathews*, 424 U.S. at 333 (internal quotation marks and citation omitted). The State Department thus infringed on a constitutionally protected liberty interest—his right to travel—without due process.

For reasons not well-explained in the administrative record, Hadwan's three separate requests for a limited validity passport to return to the United States for his hearing were denied. As Hadwan's attorney suggested at his revocation hearing, these denials may have occurred because unlike many citizens whose passports are revoked while overseas, Hadwan is a natural-born citizen, not a naturalized citizen. *See* J. App'x 115–16; *see also Hizam*, 747 F.3d at 107 (describing differences between citizenship acquired at birth and citizenship acquired later through naturalization). The State Department has acknowledged that its own formal guidance to the Sana'a Embassy instructed staff to "notify bearers of

revoked passports who held valid citizenship evidence, i.e., naturalization certificates, that they might obtain limited validity passports in their true names." OIG Report 41.

Sana'a Embassy staff retained Hadwan's CRBA and passport during the course of the investigation. Had Hadwan been able to keep his CRBA while the formal revocation decision was pending, he could have used the CRBA to obtain a limited validity passport to attend the hearing. *See* 22 U.S.C. § 2705(2) (providing that a CRBA "shall have the same force and effect as proof of United States citizenship as certificates of naturalization or of citizenship"). But because the Sana'a Embassy staff retained both documents, Hadwan was unable to present any documents attesting to his citizenship status in an application for a limited validity passport.

With Hadwan himself unable to attend, or even to communicate with his attorney to effectively prepare his case, his hearing was not held at a "meaningful time and in a meaningful manner." *Matthews*, 424 U.S. at 333 (citation omitted). The State Department had multiple tools at its disposal to afford Hadwan a reasonable opportunity to develop the administrative record and effectively state his case. The State Department could have granted him a limited validity

38

passport, granted his attorney's request for a second continuance, or made use of any of the discovery tools from 22 C.F.R. § 51.71(f) to request a deposition or affidavit from Howell, the purported witness "Mohammed," or Hadwan himself.

While we prescribe no particular process that the State Department must follow, *see Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 548–49 (1978), we hold it to its obligation to conform its adjudications to the minimum requirements of the Due Process Clause. *Cf.* Dissenting Op. 20–21. The dissenting opinion asserts that the State Department satisfies this standard even when it conducts a hearing as perfunctory as the one accorded Hadwan. *See id*. 12–23. But the Constitution requires not only an opportunity to challenge a revocation, but a "meaningful" one. *See Mathews*, 424 U.S. at 333 (quoting *Armstrong*, 380 U.S. at 552).

Hadwan's CRBA and passport were revoked nearly twelve years ago. In that time, he has never been given a meaningful opportunity to contest this revocation, even though the OIG Report found "there were no particularized national security concerns" related to Hadwan himself. OIG Report 21. We hold

39

that the State Department's adjudication did not accord Hadwan due process, and accordingly, we reverse.

## CONCLUSION

We hold that the State Department committed two errors in this case. First, its decision to uphold the revocation of Hadwan's CRBA and passport was arbitrary and capricious because it entirely failed to consider material, undisputed facts. And second, the State Department's adjudication process in Hadwan's case was constitutionally inadequate because he was never offered a hearing at which he could be present and plead his case in a meaningful manner.

Subsequent regulatory and policy changes may well have remedied the constitutional deficiency in the State Department's passport adjudication system that we observe in this case. As noted *supra*, the current version of 22 C.F.R. § 51.71(b) allows revocation hearings to take place overseas "at the appropriate U.S. diplomatic or consular post." And in its response to the OIG Report, the State Department committed itself to issuing updated guidance on the "circumstances in which individuals whose passports are retained, confiscated, or revoked while overseas are entitled to limited validity passports to return to the United States." OIG Report 24.

These subsequent policy changes, however, are of no help to Hadwan, who has remained in Yemen for nearly twelve years. To remedy these violations of Hadwan's rights under the Administrative Procedure Act and the Fifth Amendment of the U.S. Constitution, we reverse the State Department's decision to uphold the revocation and order the State Department to return his CRBA and expired passport. Hadwan is thus free to use his CRBA to apply for a new passport if he chooses.

For the foregoing reasons, we REVERSE the judgment of the district court, REVERSE the State Department's decision to uphold the revocation of Hadwan's passport, and ORDER the State Department to return Hadwan's CRBA and expired passport so that he may reapply for a new United States passport without prejudice if he so chooses.

MENASHI, *Circuit Judge*, dissenting:

This case is straightforward. The U.S. Department of State obtained a signed statement from Mansoor Hamoud Hadwan that Hadwan's actual parents were not the parents he identified on his applications for a passport and a Consular Report of Birth Abroad. Based on the signed statement, the State Department determined that Hadwan had fraudulently obtained those documents, so it confiscated the passport and the CRBA. The State Department sent Hadwan a letter notifying him of the revocation, providing its reasons for doing so, and informing him that he could request a hearing to contest the revocation. Hadwan then retained counsel who requested the hearing. Hadwan's counsel had four months following that request to obtain evidence, to submit a brief in support of Hadwan, and to prepare arguments for the hearing. The State Department even postponed the hearing by eight weeks at the request of Hadwan's counsel to allow more time to obtain evidence. At the hearing, Hadwan's counsel raised what he saw as the central issue in the case: whether Hadwan had knowingly and voluntarily signed the statement.

During the hearing—and, indeed, throughout the nearly eleven years that followed—Hadwan produced no evidence to support his claim that he did not knowingly and voluntarily sign the statement. He did not even offer an affidavit providing his account of why he signed it. The record contained only one piece of evidence: the statement itself. It is unsurprising that—based on the content and character of the statement, and given the lack of contrary evidence from Hadwan—the hearing officer upheld the State Department's revocation decision.

According to today's opinion, however, the hearing officer's decision was arbitrary and capricious because she "entirely failed to consider" the issue of whether Hadwan knowingly and voluntarily signed the statement. *Ante* at 24. And because Hadwan "was not able to attend his own revocation hearing or even participate meaningfully in making his arguments," the State Department violated the Constitution of the United States. *Id.* at 37.

Both conclusions are wrong. The hearing officer considered Hadwan's argument that he did not knowingly and voluntarily sign the statement—exploring that issue throughout the hearing—and she even identified the issue as a "major question" she answered in her written decision. App'x 110-11, 118, 144. The hearing officer rejected the argument because she determined that the statement was authentic and because Hadwan "did not submit any additional evidence or statement." *Id.* at 144. Her decision was neither arbitrary nor capricious. And far from depriving Hadwan of constitutional due process, the State Department provided him with a clear statement of its reasons for revoking his documents and a meaningful opportunity to contest that decision through counsel at a hearing. The Constitution does not demand that the State Department provide more than that notice and opportunity to be heard.

Neither the Administrative Procedure Act nor the Due Process Clause authorizes a federal court to micromanage the State Department's procedures for revoking a passport or to countermand its decision because the court would have reached a different conclusion. But that is what today's opinion does—going so far as to lecture the State Department that it should have used various discretionary "tools at its disposal" to conduct its hearing in a way that no law requires. *Ante* at 38. There is no justification for such an intervention into State Department procedures. I dissent.

2

# I

"The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); *see Const. Pipeline Co., LLC v. N.Y. State Dep't of Env't Conservation*, 868 F.3d 87, 102 (2d Cir. 2017) ("Under the arbitrary-and-capricious standard, [a] reviewing court may not itself weigh the evidence or substitute its judgment for that of the agency.") (internal quotation marks omitted). Even when the agency's reasoning is of "less than ideal clarity," we will uphold the agency's decision as long as "the agency's path may reasonably be discerned." *State Farm*, 463 U.S. at 43 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)). "In other words, so long as the agency examines the relevant data and has set out a satisfactory explanation including a rational connection between the facts found and the choice made, a reviewing court will uphold the agency action, even a decision that is not perfectly clear." *Karpova v. Snow*, 497 F.3d 262, 268 (2d Cir. 2007).

When we apply the arbitrary-and-capricious standard to determine whether the outcome of an agency adjudication had "needed factual support"—which the majority claims was lacking here—"there is no substantive difference between what it requires and what would be required by the substantial evidence test." *Ass'n of Data Processing Serv. Orgs. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 683-84 (D.C. Cir. 1984) (emphasis omitted). We may vacate the agency decision only if the factual support was so lacking as to justify the equivalent of a directed verdict—that is, the evidence was "not 'enough to justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn is one of fact for the

3

jury.'" *Id.* at 684 (alteration omitted) (quoting *Ill. Cent. R.R. Co. v. Norfolk & W. Ry. Co.*, 385 U.S. 57, 66 (1966)).

Under this deferential standard of review, the district court did not err in holding that the State Department's revocation decision was neither arbitrary nor capricious. Far from "entirely fail[ing] to consider an important aspect of the problem," *State Farm*, 463 U.S. at 43, the hearing officer directly considered Hadwan's argument that he did not sign the statement knowingly and voluntarily. She rejected the argument based on the character and content of the signed statement—which was the only evidence in the record—and provided a reasoned explanation supported by the evidence.

## A

The majority concludes that the State Department "entirely fail[ed] to answer th[e] question" of whether Hadwan's signed statement was "accurate or whether Mr. Hadwan actually knew what he signed." *Ante* at 25. That is wrong. Both the hearing transcript and the hearing officer's written decision show that the hearing officer considered Hadwan's argument and rejected the argument based on the evidence in the record.

Start with the hearing. Hadwan's administrative counsel, Howard Baker, raised the issue of voluntariness at the outset of the hearing when he said "[t]he first issue essentially relates to this allegedly voluntary statement. … [T]here's a major question here of whether or not Mr. Hadwan knows the content of this paper that he signed, allegedly, voluntarily." App'x 110-11. Baker further argued that Hadwan "was intimidated and he had no idea what he signed …. That's basically the issue in this case, … a question of whether or not this so-called voluntary statement was voluntarily given and knowingly giv[en], and I'm putting that in … question." *Id.*

4

at 114; *see also id.* at 118 ("I'm putting into question the allegedly voluntary statement.").

The hearing officer responded to this argument. She asked Baker whether he had any "information from [Hadwan] on what transpired that day or from his perspective what happened." *Id.* at 118. Baker conceded that "from him, directly, no." *Id.*; *see also id.* at 119 (the hearing officer asking Baker if he "kn[ew] with whom" Hadwan "communicated … at the Embassy").

The majority attempts to minimize the hearing officer's focus on the knowing and voluntary character of the statement by stating that she "asked only a few follow-up questions." *Ante* at 25. But the inquiry focused on these initial questions not because the hearing officer was uninterested in the issue but because Baker offered no evidence to cast doubt on the record evidence showing that the statement was knowing and voluntary. The hearing officer pressed him repeatedly to provide an alternative account of the statement from Hadwan's perspective, but Baker did not even introduce an affidavit from Hadwan stating that he did not knowingly and voluntarily sign. The hearing officer asked Baker for information regarding how and why Hadwan signed the statement, and Baker had nothing to offer. When the State Department's counsel asked whether Baker planned to submit any documents, Baker responded that not only did he "have no documents" but a DNA test was "the *only thing* [he]'d like to introduce." App'x 124. (emphasis added). Baker even admitted to the hearing officer that he did not know whether Hadwan had made the statement knowingly and voluntarily. "I don't know if it was voluntary or if he was under duress, under coercion, under fear or if he was just tricked," he said, making clear that Baker offered only speculation about why Hadwan signed it. *Id.* at 118.

The State Department, by contrast, responded to that speculation with concrete reasons for the hearing officer to find the statement to be legitimate. The State Department noted that "Mr. Howell, the special agent, does not have the authority to decide to revoke a passport" and that "the decision is made by the Office of Legal Affairs, within Passport Services, wh[ich] reviews evidence that a special agent [presents] or any other evidence that may be presented." *Id.* at 120. And the State Department rebutted Hadwan's argument about voluntariness by identifying characteristics of the statement that supported its authenticity. The State Department noted that the document identifies his relatives not only by name but also by photograph, and it "states that this document was read to me in Arabic and I understood the contents completely" and that "I asked Special Agent Howell to prepare this document [for] me." *Id.* at 109-10, 120-21. The State Department addressed Baker's argument that the statement lacked a separate affidavit explaining that it had been translated into Arabic. The State Department observed that a special agent signed the last page of the statement, and "the fact that someone signed this would suggest that they are admitting that they prepared the document, as it says, within the confession itself." *Id.* at 121.

The hearing officer later issued a written decision resolving Hadwan's challenge—which further demonstrates that she considered the arguments raised at the hearing. The very first line of the written decision acknowledges that "[d]uring the hearing, Mr. Baker stated 'So, there's a major question here of whether or not Mr. Hadwan knows the content of this paper that he signed, allegedly, voluntarily.'" *Id.* at 144. The hearing officer rejected that argument because of the specific language and characteristics of the statement and because, as the hearing officer emphasized, "Petitioner did not submit any additional evidence or statement." *Id.*

6

The hearing officer did not "entirely fail[] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. She considered Hadwan's argument but upheld the revocation based on the evidence before her. She "examine[d] the relevant data" and set out "a rational connection between the facts found and the choice made." *Karpova*, 497 F.3d at 268.

**B**

The majority faults the hearing officer for relying on the content of the signed statement to uphold the revocation decision. According to the court, "an argument that a statement in a foreign language was not signed knowingly is not disproven merely by pointing to the *content* of the statement." *Ante* at 26.

But that does not describe what the hearing officer did. The hearing officer's written decision—as well as the hearing transcript—establish that the hearing officer relied both on the characteristics of the statement and on the absence of evidence from Hadwan that the statement was fraudulently obtained. *See* App'x 118, 144. Imagine that we were considering a breach of contract case in which the contract had been introduced into evidence. No one doubts that to survive summary judgment, the plaintiff would need to "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "[R]ather than merely 'deny the moving party's allegations in a general way,' the party opposing summary judgment 'must present competent evidence that creates a genuine issue of material fact.'" *McKinney v. City of Middletown*, 49 F.4th 730, 738 (2d Cir. 2022) (quoting *FEC v. Toledano*, 317 F.3d 939, 950 (9th Cir. 2002)). If the plaintiff introduced no evidence to dispute the authenticity of the contract, a court would properly conclude that there was no

7

genuine dispute as to whether the contract was valid. "[U]nsupported allegations"—especially such inconsistent speculation as Baker offered at the hearing—"do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

That familiar scenario is what happened here. The hearing officer and the government each asked whether Baker had *anything* to substantiate his speculation that the statement was involuntary. Hadwan failed to provide any such evidence, and even now—more than a decade later—Hadwan has still failed to introduce so much as an affidavit supporting his argument that he signed the statement unknowingly or involuntarily. He has not even provided the DNA test that Baker said he wanted to introduce in 2014—even though the State Department has repeatedly said it would consider such evidence if Hadwan ever gets around to producing it.[1]

Because Hadwan submitted no evidence, the hearing officer appropriately evaluated the authenticity of the statement based on the only evidence in the record: the statement itself. In evaluating the statement, the hearing officer did not, as the majority claims, point only to the sentence asserting that the statement had been translated into Arabic. *Ante* at 26. The hearing officer also identified specific

---

[1] *See* App'x 650 (the government stating in its memorandum in support of the motion for summary judgment that "the Department of State remains willing to facilitate and review a properly submitted DNA sample at any time"); Appellee's Br. 38 n.6 ("As the government informed Hadwan when this action was before the district court, the government is willing to facilitate and review a properly submitted DNA sample at any time."); Oral Argument Audio Recording at 22:32 (the government agreeing during oral argument in this appeal that "it is willing to facilitate and consider a DNA test at any time" but "is not aware of any attempts" on Hadwan's part to submit such a test).

characteristics of the statement—such as the level of detail the statement contained about Hadwan's applications for other persons and the true identities of his parents—and concluded that such characteristics supported the conclusion that the statement was authentic.

That is a sensible and familiar way of determining the authenticity of a statement. Factfinders often rely on the content of a statement to determine whether it is credible, and courts have said that it is appropriate to do so. *See, e.g.*, *Shunfu Li v. Mukasey*, 529 F.3d 141, 147 (2d Cir. 2008) ("A fact finder may understandably find detailed testimony more convincing than vague testimony."); *Mitchell v. City of Tulsa*, 90 F. App'x 273, 275 (10th Cir. 2003) (identifying "the detail of the report" among "indicia that the report was credible"); *United States v. Jones*, 208 F.3d 603, 609 (7th Cir. 2000) (including "the degree of detail given" among "indicia of reliability"); *Ray v. Turner*, 587 F.2d 1187, 1195 (D.C. Cir. 1978) ("Reasonable specificity in affidavits connotes a quality of reliability."); *see also Strickler v. Greene*, 527 U.S. 263, 304 (1999) (Souter, J., concurring in part and dissenting in part) (describing testimony that "recalled detail after detail" as bearing "one of the inherent hallmarks of reliability"). In fact, Baker himself urged the hearing officer to consider the content of the statement when he argued that, given that content, it would not have made sense for Hadwan to sign it voluntarily. *See* App'x 121-22. That argument—in which the content of the statement calls into question its authenticity—is coherent. It is just as coherent as the argument that the hearing officer adopted: the level of detail the statement contained suggests that it was authentic.[2]

---

[2] The majority suggests that the reasoning of the hearing officer was "circular[]." *Ante* at 26. Circular reasoning occurs when, in support of a

Because the hearing officer reasonably determined that the statement was authentic, she could rely on the statement to address the "material, undisputed facts" that the majority incorrectly claims were ignored. *Ante* at 24. The statement notes that Hadwan could not read or write well in English, but it also says that it was translated into Arabic for Hadwan to understand. The State Department did not provide a separate certification of the translation, but the statement includes the signature of a special agent "admitting that they prepared the document." App'x 121. Such an attestation serves the same function as a certification.

The majority additionally claims that the State Department never addressed "facial discrepancies" in the statement—namely, that Hadwan's signature on the last page does not match the initials on the first three pages because the handwriting is "obviously very different." *Ante* at 27. The majority opinion does not explain what distinctive features of the handwriting it has identified. Nothing about the handwriting on the signature page appears to be obviously different from the first three pages—except to the extent that a signature written in cursive would be expected to differ from initials rendered in block-lettered print. Nor is there anything obviously implausible about Hadwan using the initials "H.H." The statement refers to him as "Hadwan Mansour Abbas Hadwan aka Mansour Hamoud Hadwan" on every page. App'x 39-42.

Perhaps some expert in handwriting analysis might be able to explain what the majority is thinking, but there is no expert report in

---

challenged premise, the argument invokes the premise itself. Here, the challenged premise was that Hadwan was aware of the content of the statement when he signed it, and it was in no way circular for the hearing officer to rely on the content and characteristics of the statement to evaluate that premise.

the record. Hadwan's actual lawyer never raised anything resembling the majority's new handwriting argument to the hearing officer. Baker argued that Hadwan had not signed the statement knowingly and voluntarily, but he never suggested that someone other than Hadwan had initialed the pages. And he did not introduce any evidence—such as the handwriting analysis the majority has now performed for the first time on appeal—to support that claim.

We do not normally address arguments that a party failed to raise during an administrative proceeding. *See Ry. Lab. Execs.' Ass'n v. United States*, 791 F.2d 994, 1000 (2d Cir. 1986) ("It is beyond cavil that a petitioner's failure to assert an argument before an administrative agency bars it from asserting that argument for the first time before a reviewing court.").[3] In any event, the hearing officer could not have acted arbitrarily and capriciously by failing to consider a purported discrepancy that Hadwan never identified and that is not, in fact, obvious from the face of the statement.

The majority acknowledges that "an agency might take into account the specificity of evidence before it to assess [its] reliability." *Ante* at 29 n.10. And the majority's own argument relies on the "facial" characteristics of the statement to question its authenticity, which itself is an acknowledgment that the authenticity of the statement may be evaluated with reference to such characteristics. So there is no real disagreement that the statement itself was evidence

---

[3] *See also Sims v. Apfel*, 530 U.S. 103, 110 (2000) (stating that "the rationale for requiring issue exhaustion is at its greatest" in cases "involv[ing] an adversarial proceeding"); *United States v. L.A. Tucker Truck Lines, Inc.*, 344 U.S. 33, 37 (1952) ("Simple fairness … requires as a general rule that courts should not topple over administrative decisions unless the administrative body not only has erred but has erred against objection made at the time appropriate under its practice.").

that Hadwan knowingly and voluntarily admitted that he fraudulently obtained his passport and CRBA. The majority weighs the evidence differently than the hearing officer did, but that is precisely what a reviewing court "may not" do when evaluating agency action under the arbitrary-and-capricious standard. *Const. Pipeline Co.*, 868 F.3d at 102.

The majority incorrectly suggests that this dissent "flips our task on its head" by observing that Hadwan offered no evidence to support his position. *Ante* at 28. In fact, when the record contains substantial evidence to support the agency's decision—as the record did here, in the form of a detailed and signed statement that purported to have been translated—it is fatal that the challenger "did not offer any evidence to undermine the [agency's] findings" during the adjudication. *Kaljaj v. DHS*, 206 F. App'x 87, 89 (2d Cir. 2006).

The "truth," as the district court correctly concluded, "is that [Hadwan's] Administrative Counsel argued a limited number of unsupported reasons why Plaintiff's statement was involuntary, the agency rejected them, and nothing now compels a different result." *Hadwan v. U.S. Dep't of State*, No. 17-CV-578, 2022 WL 1720397, at *5 (S.D.N.Y. May 27, 2022). Hadwan received the revocation letter on March 24, 2014; the hearing took place on August 27, 2014; and the hearing officer's decision was issued on April 9, 2015. At no point during this year-long process did Hadwan submit any evidence to substantiate his claim that the statement he apparently signed, with all its detail, was not made knowingly and voluntarily. The record before the hearing officer included (1) the signed statement on which the State Department had relied in revoking Hadwan's passport and CRBA, which included the signature of a special agent, and (2) concerns that Hadwan's counsel raised at the hearing, without any supporting evidence, that Hadwan may not have understood the

12

statement. The hearing officer reasonably decided to credit the signed statement and to uphold the revocation. That decision was neither arbitrary nor capricious.

## II

Perhaps dissatisfied with reliance on the more mundane arbitrary-and-capricious standard, the majority goes on to hold that the State Department additionally violated the Constitution of the United States.[4] The majority explains that the State Department violated the Constitution in some mysterious way that does not "call into question the constitutionality of any specific aspect of the State Department's adjudication process" but that nevertheless "failed to protect Hadwan's rights" based on a purportedly "unusual and confounding" confluence of events. *Ante* at 19-20. Its holding makes no sense.

The APA provides that a court will hold unlawful and set aside agency action that is "contrary to constitutional right." 5 U.S.C. § 706(2)(B). The Due Process Clause of the Fifth Amendment provides that "[n]o person shall be … deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V. To determine whether a hearing satisfied the guarantees of the Clause, a court will balance (1) the private interest at stake,[5] (2) the risk of an erroneous

---

[4] *But see Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring) ("[I]f a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter.").

[5] The majority describes the right to travel as a "substantial liberty interest," *ante* at 36, but the Supreme Court has emphasized that while the "constitutional right of *interstate* travel is virtually unqualified," the "'right' of *international* travel has been considered to be no more than an aspect of the 'liberty' protected by the Due Process Clause of the Fifth Amendment"

13

deprivation of that interest, and (3) the government's interest. *Mathews v. Eldrige*, 424 U.S. 319, 335 (1976). The majority acknowledges that the government has a significant interest in passport revocations due to national security and foreign policy considerations. *See ante* at 32-33. And the majority recognizes that "State Department regulations and policies establish a carefully constructed adjudication system that, in most situations, adequately balances" the private and public interests. *Id.* at 32.

In this case, Hadwan received notice of the reasons for the revocation and a hearing at which he could contest the revocation, was represented by counsel, and had the opportunity to present evidence. Despite all this process, the majority somehow concludes that the State Department "never offered a hearing at which he could be present and plead his case in a meaningful manner." *Id.* at 40. That is wrong again.

**A**

"The essence of due process is the requirement that 'a person in jeopardy of serious loss be given notice of the case against him and opportunity to meet it.'" *Mathews*, 424 U.S. at 348 (alteration omitted) (quoting *Joint Anti-Fascist Comm. v. McGrath*, 341 U.S. 123, 171-72 (1951) (Frankfurter, J., concurring)). The "fundamental requirement of due process is 'the opportunity to be heard' … at a meaningful time and in a meaningful manner." *Armstrong v. Manzo*, 380 U.S. 545, 552

---

and may "be regulated within the bounds of due process." *Haig v. Agee*, 453 U.S. 280, 307 (1981) (emphasis added) (quoting *Califano v. Aznavorian*, 439 U.S. 170, 176 (1978)). Accordingly, the Supreme Court has warned that courts should not treat the "right to travel within the United States and the right to travel abroad … indiscriminately." *Regan v. Wald*, 468 U.S. 222, 241 n.25 (1984).

(1965) (quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)). As applied to a person whose passport has been revoked, "[t]he Constitution's due process guarantees call for no more than … a statement of reasons and an opportunity for a prompt postrevocation hearing." *Haig*, 453 U.S. at 310.

The question here is whether the State Department provided Hadwan with a statement of its reasons and a meaningful opportunity to contest the revocation at a postrevocation hearing. The answer is obviously yes.

First, the State Department notified Hadwan in writing of its reasons for revoking his passport and CRBA. Five months before the hearing, the State Department sent Hadwan a letter explaining its revocation decision. The State Department also provided Baker with the brief and exhibits that it submitted to the hearing officer.[6] These documents explain that based on Hadwan's signed statement, the State Department believed that "Hadwan's passport and CRBA were obtained illegally, fraudulently or erroneously, based on false statements of material fact." App'x 46. The State Department thereby provided a statement of reasons.

Second, Hadwan had a meaningful opportunity to respond to the State Department's revocation decision before, during, and after the hearing. Before the hearing, Hadwan could have submitted evidence in support of his arguments. Baker requested a hearing on April 21, 2014—four months before the hearing occurred. On May 29, 2014, the State Department notified Baker of the original hearing date, instructed him to submit any brief in support of Hadwan by June 23,

---

[6] The exhibits included Hadwan's passport and CRBA applications, the revocation letter, and Hadwan's signed statement.

15

2014, and provided instructions for submitting the brief. When Baker requested a continuance to allow him more time to obtain evidence, the State Department postponed the hearing by eight weeks and extended the deadline to submit Hadwan's brief to August 13, 2014.

The hearing officer then invited Baker during the hearing to provide additional information. *See id.* at 118 (hearing officer asking Baker whether he had "information from [Hadwan] on what transpired that day or from his perspective what happened"); *id.* at 119 (hearing officer asking Baker "who [Hadwan] got that information from [and] who he communicated with at the Embassy"). The State Department's counsel also asked whether Baker intended to submit any documentation.

Even after the hearing, Baker could have sought to supplement the record before the hearing officer issued her decision. More than six months passed between the hearing and the issuance of the decision. In fact, Baker asked during the hearing whether he could submit a DNA test "before a decision is reached." *Id.* at 124. But Hadwan never did so—and he still has not.

All told, the State Department provided Hadwan with (1) a clear statement of reasons for revoking his passport and CRBA, (2) an opportunity for him and his counsel to obtain evidence in support of his arguments, and (3) a hearing during which he was represented by counsel and invited to present evidence. Because Hadwan received "the opportunity to be heard at a meaningful time and in a meaningful manner," *Mathews*, 424 U.S. at 333 (internal quotation marks omitted), the State Department did not deprive Hadwan of his constitutional right to due process.

16

**B**

The majority nevertheless insists that the hearing was constitutionally inadequate because Hadwan could not attend in person. The majority says that "[h]ad Hadwan been able to keep his CRBA while the formal revocation decision was pending, he could have used the CRBA to obtain a limited validity passport to attend the hearing." *Ante* at 38. But the State Department believed Hadwan's CRBA application contained "false statements of material fact." App'x 14. The Constitution did not require the State Department to allow Hadwan to retain a document that it determined was fraudulently obtained and to use that fraudulent document to obtain a limited validity passport. If Hadwan were entitled to retain the fraudulently obtained CRBA until the conclusion of his hearing, he would effectively have the right to a *prerevocation* hearing—and even the majority recognizes that the Constitution does not require that. *See ante* at 32-33. The Due Process Clause required that Hadwan receive "*no more* than … a statement of reasons and an opportunity for a prompt *postrevocation* hearing." *Haig*, 453 U.S. at 310 (emphasis added). And the Supreme Court has declined to hold that even "these procedures are constitutionally required." *Id.* at 310 n.62.

The State Department regulations provided that Hadwan could request a hearing and that he could attend in person "or with or by his designated attorney." 22 C.F.R. § 51.71(b) (2008). Hadwan retained Baker to represent him, and Baker had four months from the date he requested a hearing to obtain evidence, to submit a brief on behalf of Hadwan, and to prepare arguments for the hearing. At the hearing, Baker had the opportunity to argue that Hadwan had not signed the statement knowingly and voluntarily, and both the hearing officer and the State Department asked whether he had any other evidence to introduce. Hadwan thus had a meaningful

17

opportunity to present his case to the State Department through counsel.

Hadwan has made no showing that the lack of his physical presence deprived him of such an opportunity. We generally "require parties to give the agency an opportunity to address an issue before seeking judicial review of that question." *Carr v. Saul*, 593 U.S. 83, 88 (2021). At no point before or during the hearing did Baker raise the issue of Hadwan's physical attendance.[7] Baker never mentioned that Hadwan had applied for a limited validity passport or asked the State Department to delay the hearing until Hadwan could attend. In fact, when Baker first requested a continuance until August or September, he told the State Department that "any date you choose should be fine with us." App'x 62. The State Department had no reason to believe

---

[7] The majority excuses Hadwan from the requirement to raise his due process argument to the agency. *See ante* at 36. We normally "decide whether to require issue exhaustion based on 'an analogy to the rule that appellate courts will not consider arguments not raised before trial courts.'" *Carr*, 593 U.S. at 88 (quoting *Sims*, 530 U.S. at 108-09); *see also Sandoz Inc. v. Becerra*, 57 F.4th 272, 278-79 (D.C. Cir. 2023). This is not a case in which the constitutional challenge "fall[s] outside the adjudicators' areas of technical expertise." *Carr*, 593 U.S. at 92. To the contrary, the agency "will be in a better position than federal courts or Congress itself to design procedural rules adapted to … the tasks of the agency involved." *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 525 (1978) (quoting *FCC v. Schreiber*, 381 U.S. 279, 290 (1965)). It would not have been futile for Hadwan to raise his due process claim before the State Department because it had the authority to implement additional procedures. *See, e.g.*, 22 C.F.R. § 51.71(e) (2008) (providing that the hearing officer "may, in his or her discretion, accept an affidavit from or order a deposition of [a] witness" who "is unable to appear in person"). And the hearing in this case resembled "an adversarial suit in which parties are expected to identify, argue, and preserve all issues." *Carr*, 593 U.S. at 96 (Thomas, J., concurring in part and concurring in the judgment).

18

that allowing Hadwan to present arguments through counsel would render the proceeding constitutionally inadequate. A reviewing court must "review[] the agency's choice of procedures … on the basis of the information available to the agency when it made the decision to structure the proceedings in a certain way." *Vt. Yankee*, 435 U.S. at 547. We do not engage in "Monday morning quarterbacking" by examining in hindsight "the record actually produced at the hearing." *Id.*

Even so, the record here reveals that Hadwan's physical presence would not have made a difference. Hadwan did not even submit an affidavit in his own defense; in no way did the outcome of the hearing turn on Hadwan's physical absence. We have held that "[a] litigant has 'no constitutional right to be present, or to testify, at his own civil trial,'" *Davidson v. Desai*, 964 F.3d 122, 129 (2d Cir. 2020) (quoting *Latiolais v. Whitley*, 93 F.3d 205, 208 (5th Cir. 1996)), because the "constitutional right of 'access to the courts' … is satisfied by an 'opportunity to consult with counsel and to present his case to the court,' which typically can be accomplished even when the litigant is not physically present at the courthouse," *id.* (quoting *Perotti v. Quinones*, 790 F.3d 712, 721 (7th Cir. 2015)). Given that holding, it is anomalous for our court now to declare that the Constitution requires the physical presence of a litigant at his administrative passport revocation hearing.

"The requirements of due process are 'flexible and call for such procedural protections as the particular situation demands.'" *Wilkinson v. Austin*, 545 U.S. 209, 224 (2005) (alteration omitted) (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). The majority in this case recognizes that "the State Department's adjudication system adequately protects due process rights in most situations." *Ante* at 34. That amounts to a concession that Hadwan has not shown that the

19

procedures the agency followed created an "unacceptably high" risk of an erroneous deprivation. *Francis v. Fiacco*, 942 F.3d 126, 143 (2d Cir. 2019). Nor has Hadwan shown the "probable value, if any," of his presence at the hearing. *Mathews*, 424 U.S. at 335; *see also Doolen v. Wormuth*, 5 F.4th 125, 134 (2d Cir. 2021) (rejecting a due process claim because the "value of requiring" the proposed procedure was "minimal").

It has been more than a decade since the hearing, and Hadwan still has not submitted any evidence supporting his claims. "[W]e cannot uncritically assume without proof that [the proposed procedure] would be more advantageous to the accused." *DeMichele v. Greenburgh Cent. Sch. Dist. No. 7*, 167 F.3d 784, 792 (2d Cir. 1999). But that is what the majority does today.

## C

The majority suggests that—to facilitate Hadwan's participation in the hearing—the State Department could have issued him a limited validity passport, granted another continuance, or collected evidence on Hadwan's behalf. *See ante* at 38-39. Perhaps the State Department had the discretion to do such things, but no law required it.[8] There is no justification for this court to micromanage the hearing procedures of the State Department by requiring it to take

---

[8] *See* 22 C.F.R. § 51.62(a)(2) (2008) (providing that the State Department may "limit a passport," instead of revoking it, when "[t]he passport has been obtained illegally, fraudulently or erroneously"); *id.* § 51.70(c) (providing that a hearing will be held within sixty days after the State Department receives a request for a hearing "unless the person requesting the hearing asks for a later date and the department and the hearing officer agree"); *id.* § 51.71(e) (providing that a hearing officer "may, in his or her discretion, accept an affidavit from or order a deposition of the witness" when that "witness is unable to appear in person").

20

actions that the law makes discretionary. "Agencies are free to grant additional procedural rights in the exercise of their discretion, but reviewing courts are generally not free to impose them if the agencies have not chosen to grant them." *Vt. Yankee*, 435 U.S. at 524. "[I]t is long since settled that a reviewing court is 'generally not free to impose' additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel." *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021) (quoting *Vt. Yankee*, 435 U.S. at 524).

The majority claims that it has prescribed "no particular process that the State Department must follow." *Ante* at 39 (citing *Vt. Yankee*, 435 U.S. at 548-49). But a reader could be forgiven for understanding the majority to hold that the State Department was required to issue Hadwan a limited validity passport for him to attend the hearing in person.[9] After all, the majority concludes that the "adjudication process in Hadwan's case was constitutionally inadequate because he was never offered a hearing *at which he could be present* and plead his case in a meaningful manner." *Ante* at 40 (emphasis added). But even if the majority has prescribed the choice

---

[9] *See, e.g., ante* at 10 ("Hadwan states that he filed three separate applications for a limited validity passport to return to the United States to attend his hearing, all of which were denied. It is unclear from the record why Hadwan was unable to obtain a limited validity passport.") (citation omitted); *id.* at 35 ("[T]he State Department was able to facilitate passport holders' ability to attend their hearings in person by issuing limited validity passports for direct return to the United States."); *id.* at 37 ("For reasons not well-explained in the administrative record, Hadwan's three separate requests for a limited validity passport to return to the United States for his hearing were denied."); *id.* at 38 ("Had Hadwan been able to keep his CRBA while the formal revocation decision was pending, he could have used the CRBA to obtain a limited validity passport to attend the hearing.").

21

of one of three discretionary procedures,[10] it would represent the same sort of lawless imposition on the agency.

The majority speculates that Hadwan may have been denied a limited validity passport "[b]ecause of an unusual and confounding interaction among statutes, regulations, and written and unwritten State Department policies." *Ante* at 19. The purportedly unexpected result, as the majority explains it, is that "bearers of revoked passports who held valid citizenship evidence, i.e., naturalization certificates, … might obtain limited validity passports" based on that evidence of citizenship. *Id.* at 37-38. Hadwan, however, could not rely on a naturalization certificate because his evidence of citizenship was his CRBA, which the State Department confiscated because it determined that Hadwan had fraudulently obtained it.[11] "Had Hadwan been

---

[10] *See ante* at 38-39 ("The State Department could have granted him a limited validity passport, granted his attorney's request for a second continuance, or made use of any of the discovery tools from 22 C.F.R. § 51.71(f) to request a deposition or affidavit from Howell, the purported witness 'Mohammed,' or Hadwan himself.").

[11] The majority describes Hadwan as a "natural-born citizen," relying on the decision of the Supreme Court in *United States v. Wong Kim Ark*, 169 U.S. 649 (1898). *See ante* at 5-6 & n.5. *Wong Kim Ark*, however, held that a "person born out of the jurisdiction of the United States" who obtains citizenship based on "the enactments conferring citizenship upon foreign-born children of citizens" has "become a citizen by being naturalized." *Wong Kim Ark*, 169 U.S. at 702-03; *see also Rogers v. Bellei*, 401 U.S. 815, 839-41 (1971) (Black, J., dissenting) ("Although those Americans who acquire their citizenship under statutes conferring citizenship on the foreign-born children of citizens are not popularly thought of as naturalized citizens, the use of the word 'naturalize' in this way has a considerable constitutional history. … All means of obtaining American citizenship which are dependent upon a congressional enactment are forms of naturalization."). Perhaps *Wong Kim Ark* was wrong on this point, *see, e.g.*, Paul Clement &

able to keep his CRBA while the formal revocation decision was pending," the majority says, "he could have used the CRBA to obtain a limited validity passport to attend the hearing." *Ante* at 38. The majority suggests that—by invalidating the decision of the State Department and holding that it was required to exercise its discretionary authority in this case—it is fixing this purported oversight in the regulatory framework.

That sort of regulatory policymaking is not this court's business. *See Ming Dai*, 593 U.S. at 365; *Vt. Yankee*, 435 U.S. at 524. Not only is there no legal justification for it, but it is simply not "confounding" that the State Department would confiscate a CRBA it has determined was fraudulently obtained. Congress has authorized the State Department to do precisely that. *See* 8 U.S.C. § 1504(a) (authorizing the Secretary of State to cancel a CRBA "if it appears that such document was illegally, fraudulently, or erroneously obtained" and providing the CRBA holder with a postrevocation hearing); *see also* 22 C.F.R. § 51.62(c)(1). Congress has placed oversight of a fraudulently obtained naturalization certificate in a different agency. *See* 8 U.S.C. § 1453 (authorizing the cancellation of a naturalization certificate "if it shall appear to the Attorney General's satisfaction that such document … was illegally or fraudulently obtained" and providing the certificate holder "at least sixty days in which to show cause why such document or record should not be canceled"); 8 C.F.R. § 342.1.[12]

---

Neal Katyal, *On the Meaning of "Natural Born Citizen,"* 128 Harv. L. Rev. F. 161 (2015); 8 U.S.C. § 1101(a)(23), but that is what it said.

[12] *But see* 22 C.F.R. § 51.46 (authorizing the State Department to "retain evidence" of U.S. citizenship "submitted in connection with an application

These statutes are not unconstitutional. [13] Contrary to the majority opinion, the Due Process Clause does not override § 1504(a) to require the State Department to allow a bearer to retain a fraudulently obtained CRBA in order to acquire still more official documents from the United States. In this context, "the [g]overnment is not required to hold a prerevocation hearing" that leaves the document in the bearer's hands but may instead adjudicate entitlement to the document after it is revoked. *Haig*, 453 U.S. at 309.

As it was, Hadwan received notice and an opportunity to be heard. He received a statement of the State Department's reasons for revoking his passport and CRBA, several months to prepare arguments and evidence, and a hearing during which his counsel could present arguments and evidence to challenge the revocation. Hadwan—and, apparently, the majority—may not like the outcome of that hearing. But "[t]he Constitution's due process guarantees call for no more than what has been accorded here." *Id.* at 310.

\* \* \*

The majority relies on extra-record evidence—including an investigation by the inspector general of the State Department that occurred years after Hadwan's hearing—to suggest that the outcome of the hearing might be different if it were held today. But these subsequent developments have no bearing on whether the State Department, given the record before it, acted arbitrarily and

for a passport … when it deems it necessary for anti-fraud or law enforcement or other similar purposes").

[13] *Cf. L. Xia v. Tillerson*, 865 F.3d 643, 655 (D.C. Cir. 2017) ("Because the administrative actions plaintiffs challenged were incapable of vitiating citizenship, plaintiffs were not entitled to denaturalization's pre-deprivation judicial process.").

capriciously or denied Hadwan due process. "This sort of Monday morning quarterbacking" exceeds the scope of our review. *Vt. Yankee*, 435 U.S. at 547.

As it happens, it is not even necessary to distort the applicable law in order to provide Hadwan with a new opportunity to establish his entitlement to a passport or a CRBA. He may simply apply for a new passport. His administrative counsel raised this possibility during the hearing when he said he "wanted to have … on the record" that Hadwan could "come back and make an application." App'x 125. The hearing officer responded "[t]hat's absolutely correct." *Id.* And the government has maintained that position a decade later in this appeal. The government stated at oral argument that Hadwan may file a "new application," and the State Department would "look to it with fresh eyes" such that "the prior affidavit is not preclusive." [14] Perhaps if he submits a new application Hadwan might finally identify evidence supporting his claim that the signed statement was involuntary. Or maybe he will produce the DNA test that he promised a decade ago.

This case, however, concerns whether the State Department acted arbitrarily, capriciously, or unconstitutionally when it upheld the revocation of Hadwan's passport and CRBA based on the record before it. There is no serious argument that it did. Accordingly, I dissent.

---

[14] Oral Argument Audio Recording at 25:20.